USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: NOV 07 2012

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

              -against-

CHARLES WASHINGTON,
                                Defendant.

------------------------------------------------------------X

12 Cr. 146 (JPO)

MEMORANDUM AND ORDER

J. PAUL OETKEN, District Judge:

Defendant, Charles Washington, has moved to suppress evidence obtained during a search of his apartment on December 7, 2011. The Court concludes that an evidentiary hearing on this motion is unnecessary and denies Defendant's motion to suppress.

## I. Background

On June 9, 2009, Defendant was sentenced to time served and supervised release for an offense that included participation in a "crack" cocaine trafficking conspiracy. (Affirmation of Charles Washington, Dkt. No. 7 ("Washington Aff.") at ¶ 2); (Declaration of United States Probation Officer Adam Pakula, Dkt. No. 9-1 (Pakula Dec.) at ¶ 4.) In response to a petition from the U.S. Probation Office for the Southern District of New York, Judge Swain approved a modification of Defendant's release conditions on July 15, 2009 that provided:

> Defendant shall submit his person, residence, office or vehicle to a search by a United States Probation Officer at a reasonable time and in a reasonable manner, based on reasonable suspicion of contraband or evidence of a violation of a condition of supervised release; failure to submit may be grounds for revocation and defendant shall warn any other residents that the premises may be subject to search pursuant to this condition.

(Pl. Ex. A, Dkt. No. 8-1 at 2.) Defendant executed a document certifying his acknowledgement and acceptance of this search condition as part of his term of supervised release. (*Id.* at 5.)

The indictment in this case alleges that on March 23, 2011, Defendant engaged in a drug-related conversation with a co-conspirator (CC-1) in which they discussed a narcotics transaction with a different co-conspirator (CC-2.) (Indictment, Dk. No. 1, at ¶ 4(a).) It does not allege any other "overt acts" by Defendant prior to the December 7, 2011 discovery of a quantity of "crack" cocaine during the disputed search. (*Id.* at ¶ 4(b).)

On November 28, 2011, Probation Officer Pakula was contacted by Special Agent Joseph Downs of the Federal Bureau of Investigation ("FBI") and informed that the FBI had learned through an ongoing investigation that Defendant "was a narcotics supplier" to a narcotics trafficking organization under FBI investigation. (Pakula Dec. at ¶ 3.) Specifically, Agent Downs informed Pakula that "the FBI had intercepted calls between [Defendant] and a narcotics trafficker ("CC-1") in which [Defendant] and CC-1 discussed narcotics transactions, which demonstrated to the FBI that [Defendant] was a supplier of narcotics to CC-1, and that [Defendant]'s residence may contain narcotics." (*Id.*) Pakula reviewed Defendant's records and learned of the special condition of supervised release approved by Judge Swain on July 15, 2009. (*Id.* at ¶ 4.) Relying on the information from Agent Downs, Pakula and his supervisors "determined that there was a reasonable suspicion that [Defendant] was engaging in criminal conduct and that [Defendant]'s residence may contain narcotics." (*Id.* at ¶ 5.)

On December 7, 2011, thirteen officers of the U.S. Parole Office and three FBI agents conducted a search of Defendant's residence in the Bronx ("the Residence"). (*Id.* at ¶ 6.) Defendant reports that he was "awakened by loud banging, got up, and looked through the 'peep hole' in [his] apartment door." (Washington Aff. at ¶ 3.) Defendant saw Pakula standing outside and opened the door, at which point an FBI agent "pushed [Defendant] against the wall, handcuffed [him], and took [him] out of the apartment into the hallway of [his] building." (*Id.* at

¶ 4.) Pakula remained outside the apartment during this search. (*Id.* at ¶ 4b.)[1] Defendant reports that he "waited in the building hallway wearing nothing more than [his] underwear until the FBI agent took [him] into [his] apartment to use the bathroom and get dressed," at which time he saw FBI agents searching the apartment. (*Id.* at ¶ 5.) Defendant was unable to see most of the search because he was detained in the hallway (*id.* at ¶ 6), but later learned from his attorney that "the heavy metal locked safe that I kept in a closed wardrobe had been broken open" (*id.* at ¶ 7). He affirms that he did not consent to the search. (*Id.* at ¶ 8.) Pakula reports that "search team members recovered, among other things, a safe in [Defendant]'s bedroom of the Residence, which contained a quantity of 'crack' cocaine." (Pakula Dec. at ¶ 8.)[2]

## II. Discussion

### A. Applicable Law

To ascertain whether the December 7, 2011 search of Defendant's apartment violated the Fourth Amendment, and whether it is necessary to conduct an evidentiary hearing before deciding that question, the Court must first clarify the appropriate Fourth Amendment standard for assessing the search. The Court then summarizes the law relevant to two of Defendant's arguments – stale information and use of Pakula as a "stalking horse" – before turning to the legal rules that govern when a suppression hearing is required.

#### 1. The Fourth Amendment and Supervised Release

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

---

[1] Defendant's affidavit contains two paragraphs numbered (4), so the Court refers to the second of these paragraphs as (4b).
[2] Defendant's memorandum in support of his motion to suppress contains a number of other factual assertions that purportedly bear on the constitutionality of the search. For reasons stated in the Discussion section of this opinion, the Court has not considered in its analysis these un-affirmed statements of fact from defense counsel.

3

violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. Translated into familiar doctrine, this amendment "protects the right of private citizens to be free from unreasonable government intrusions into areas where they have a legitimate expectation of privacy." *U.S. v. Newton*, 369 F.3d 659, 664 (2d Cir. 2004) (citations omitted). The reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999). A legitimate expectation of privacy exists where a person has "[has] exhibited an actual (subjective) expectation of privacy and the expectation [is] one that society is prepared to recognize as reasonable." *U.S. v. Reyes*, 283 F.3d 446, 457 (2d Cir. 2002) (citations and quotation marks omitted). In general, warrantless searches – particularly of the home – are presumed unconstitutional. *See, e.g., Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984).

In *Griffin v. Wisconsin*, however, the Supreme Court held that "[a] State's operation of a probation system, like its operation of a school, government office or prison, or its supervision of a regulated industry . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." 483 U.S. 868, 873-74 (1987). The Court explained that "[t]o a greater or lesser degree, it is always true of probationers (as we have said it to be true of parolees) that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions.'" *Id.* at 874 (citing *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). The Court added that "[t]hese restrictions are meant to assure that the probation serves

4

as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." *Id.* at 875.

More recently, in *U.S. v. Knights*, the Court upheld a search of a probationer's apartment based upon reasonable suspicion and conducted pursuant to a probation order mandating that he "submit his . . . person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." 534 U.S. 112, 114 (2001). In *Knights*, the Court dispensed with "its previous distinction between searches undertaken for probationary and for investigative purposes, and, with that distinction, the 'special needs' justification articulated in *Griffin* for reducing the level of suspicion required for probationary searches, [and] held that 'the search . . . was reasonable under our general Fourth Amendment approach of 'examining the totality of the circumstances,' with the probation search condition being a salient circumstance.'" *U.S. v. Lifshitz*, 369 F.3d 173, 180 (2d Cir. 2004) (Katzmann, J.) (citing *Knights*, 534 U.S. at 118). The Court summarized its holding by explaining that "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Knights*, 534 U.S. at 121.

The Second Circuit has since suggested – but not held – that *Knights* may also support probationary searches based upon "a lesser standard" than reasonable suspicion. *Lifshitz*, 369 F.3d at 181; *see also U.S. v. Chirino*, 483 F.3d 141, 150 (2d Cir. 2007) (McLaughlin, J., concurring) ("I write separately only to note my continuing belief that something less than reasonable suspicion may support a search of the dwelling of a felon on probation. The Supreme Court has remained expressly agnostic on this question." (citation omitted)).

In *U.S. v. Reyes*, a defendant charged with violation of the terms of his supervised release appealed a decision denying his motion to suppress evidence obtained during a home visit by his probation officer. 283 F.3d at 450. Rejecting his arguments, the Second Circuit relied upon *Griffin* and *Knights* to conclude that "the probable cause requirements of the Fourth Amendment do not apply to a federal probation officer conducting a home visit – a far less invasive form of supervision than a search – pursuant to a convicted offender's conditions of supervised release." 283 F.3d at 462; *see also id.* ("As a result, the probable cause requirements of the Fourth Amendment, which apply to a regular law enforcement officer executing a search warrant for an individual's home, simply do not apply to visits by probation officers to the homes of convicted persons serving a term of supervised release.").[3] The court noted that because the defendant had signed a probation order which authorized visits 'at any time at home or elsewhere', he "had a severely diminished expectation of privacy with respect to any home visit by a probation officer." *Id.* at 461; *see also id.* at 457 ("It is beyond doubt that Reyes's actual expectation of privacy in the environs of his home was necessarily and significantly diminished because Reyes was a convicted person serving a court-imposed term of federal supervised release that mandated home visits 'at any time' from his federal probation officer.").

The court further explained that supervised release "differs from parole in an important respect: 'unlike parole, supervised release does not replace a part of a term of incarceration, but instead is . . . given *in addition* to any term of imprisonment imposed by a court." *Id.* at 458 (citing 1 NEIL P. COHEN, THE LAW OF PROBATION AND PAROLE § 5:11, at 5-22 (2d ed. 1999) (emphasis in original)). Thus, the principles articulated in *Griffin* in relation to parole "apply *a*

---

[3] The court also held that "because home visits 'at any time' are conducted pursuant to a *court-imposed condition* of federal supervised release of which the supervisee is aware, and because a home visit is far less intrusive than a *probation search*, probation officers conducting a *home visit* are not subject to the reasonable suspicion standard applicable to *probation searches* under *Knights*." *Reyes*, 283 F.3d at 462 (emphasis in original).

6

*fortiori* to federal supervised release." *Id.* at 461 (emphasis in original). Further, "home visits . . . are routine and appropriate elements of supervising a convicted person serving a term of supervised release," *id.* at 460 (footnote omitted), since probation officers need "considerable investigative leeway" to carry out their "responsibility to the public to ensure that the offender who poses a threat to public safety is not permitted to remain free, absent compliance with conditions which obviate possible danger," *id.* at 457.

Four years later, the Supreme Court approvingly cited *Reyes* in *Samson v. California*, an opinion upholding against Fourth Amendment attack the suspicionless search of a California parolee pursuant to a state statute. 547 U.S. 843, 846 (2006). *Samson* reaffirmed the "general Fourth Amendment approach" of examining "the totality of the circumstances" to assess whether a search is reasonable, a determination made by "assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 848 (citations omitted). Noting that "a reasonable suspicion requirement" would "give parolees greater opportunity to anticipate searches and conceal criminality," the Court added that justifications drawn from the context of supervising probationers apply "with even greater force to a system of supervising parolees." *Id.* at 854-55 (citing *Reyes*, 283 F.3d at 461; *U.S. v. Crawford*, 372 F.3d 1048, 1077 (9th Cir. 2004) (Kleinfeld, J., concurring)).

In *U.S. v. Townsend*, the Second Circuit addressed a Fourth Amendment claim by a supervisee with a special condition of supervised release similar to that at issue here. *See* 371 F. App'x 122, 124 (2d Cir. 2010) *cert. denied*, 131 S. Ct. 584 (2010) (noting that the special condition provided that "[t]he defendant shall submit his person, residence . . . or any other premises under his control to a search on the basis that the probation officer has reasonable belief

7

that contraband or other evidence of a violation of the conditions of the release may be found. The search must be conducted at a reasonable time and in a reasonable manner"). In *Townsend*, the defendant claimed that his probation officer lacked a "reasonable belief" for a search where the triggering information was provided by the Bronx District Attorney's Office, which, in turn, had received it from an uncorroborated confidential informant. *Id.* The court noted that *Reyes* had not specified "the requirements for conducting a search (as opposed to a visit) of a releasee's home pursuant to a condition of his supervised release." *Id.* However, the court concluded that because the defendant's probation officer had possessed information superior to that possessed by the probation officer in *Griffin*, there was no need to specify "whether the 'reasonable belief' standard imposed by the search condition of [the defendant's] supervised release is equivalent to the 'reasonable grounds' condition at issue in *Griffin*." *Id.* (citing *Griffin*, 482 U.S. at 871).

Following the Supreme Court and the Second Circuit, courts in this district have repeatedly recognized that searches of individuals on supervised release are treated differently for Fourth Amendment purposes than searches of individuals who are not. *See, e.g., U.S. v. Goldenberg*, 05 Crim. 1034, 2006 WL 266564, at *5 (S.D.N.Y. Feb. 3, 2006) (Chin, J.) ("[A] search by probation officers that is unreasonable with respect to an individual not serving a term of supervised release may be reasonable with respect to an individual who is."). Judge Scheindlin has noted that, although *Reyes* did not create a test for searches of supervisees, the Second Circuit has upheld such searches where a law or condition of release conferred express authorization. *See U.S. v. Kone*, 591 F. Supp. 2d 593, 604 (S.D.N.Y. 2008) ("[I]n [*Reyes*], the Second Circuit upheld the constitutionality of a warrantless *visit* to the home of a person on supervised release, but the Court emphasized that warrantless home *visits* were specifically authorized by statute and that home *searches* raise different issues. The Second Circuit has

8

upheld other warrantless searches of probationers, parolees, and persons on supervised release but only in instances where either a law or a condition of release explicitly permitted such searches." (citations and footnotes omitted)).

Specifically, courts have concluded that consent to a special condition of supervised release that authorizes warrantless searches modifies the Fourth Amendment analysis, such that courts need ask only whether "the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty." *Newton*, 369 F.3d at 665-66 (citation omitted); *see also U.S. v. Justiniano*, 401 F. App'x 595, 596 (2d Cir. 2010) (applying *Newton* to uphold warrantless search of parolee who had consented to a term permitting parole officers to search his residence, person, and property at any time); *U.S. v. Pabon*, 603 F. Supp. 2d 406, 417 (N.D.N.Y. 2009) ("Such warrantless parole searches are deemed reasonable if the parolee gave consent as a condition of his release and the conduct of the parole officer is rationally and reasonably related to his duty to investigate parole violations so as to protect the public from the commission of further crimes." (citing *Newton*, 369 F.3d at 665)); *cf. Kone*, 591 F. Supp. 2d at 608 ("The Government concedes that the probation officers needed to obtain a warrant that satisfied all of the requirements of the Fourth Amendment in order to search Kone's home. This is not surprising given that no special condition of supervised release had been imposed on Kone that required him to consent to a warrantless search of his home."); *Olmeda v. Babbits*, 07 Civ. 2140, 2008 WL 282122, at *9 (S.D.N.Y. Jan. 25, 2008) ("Finally, Olmeda's claims arising from the [search] are dismissed because, *beyond the fact that consent to warrantless searches of his residence was a term of his supervised release*, Olmeda does not allege that any of defendants in this action actually conducted the search." (footnote omitted) (emphasis added)).

9

In summary, to assess the constitutionality of a warrantless search of a supervisee's residence, the Court must ascertain whether that search was supported by reasonable suspicion. *See Knights*, 534 U.S. at 118; *Lifshitz*, 369 F.3d at 180.[4] More precisely, there must have been "'reasonable suspicion' to believe that criminal activity ha[d] occurred or [wa]s about to occur." *U.S. v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995); *accord U.S. v. Sokolow*, 490 U.S. 1, 7 (1989) (requiring "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause"). Although this standard is "somewhat abstract," *U.S. v. Arvizu*, 534 U.S. 266, 274 (2002), it requires "considerably less than proof of wrongdoing by a preponderance of the evidence, *U.S. v. Villegas*, 928 F.2d 512, 516 (2d Cir. 1991) (citation omitted). In making its determination, the Court considers the "totality of the circumstances" surrounding the search. *See Samson*, 547 U.S. at 848; *Knights*, 534 U.S. at 118 (citing *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). Those circumstances include the substantially diminished expectation of privacy that accompanies a sentence of supervised release, particularly where the defendant has consented to a special condition authorizing searches of his home. *See Samson*, 547 U.S. 848; *Griffin*, 483 U.S. at 874-5; *Reyes*, 283 F.3d at 461. They also include the Government's weighty interests in promoting rehabilitation and preventing recidivism, *Griffin*, 483 U.S. at 868, and the broad investigative leeway afforded to parole officers to carry out their obligations, *Reyes*, 283 F.3d at 457. Courts have applied this reasonable suspicion standard to analogous contexts – involving special terms of release consenting to warrantless searches – by asking whether "the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty." *Newton*, 369 F.3d at 665-66 (citation omitted).

### 2. The "Stalking Horse" Defense

---

[4] Because the Court concludes that the reasonable suspicion standard is satisfied here, it need not address the open question whether a lesser standard may be appropriate in the supervised release context.

10

Several circuits recognize the so-called "stalking horse" theory as a basis for concluding that law enforcement officials have violated the Fourth Amendment while performing a search of a supervisee's person, belongings, or residence. As summarized in *U.S. v. Watts*:

> A probation officer acts as a stalking horse if he conducts a probation search on prior request of and in concert with law enforcement officers. However, collaboration between a probation officer and police does not in itself render a probation search unlawful. The appropriate inquiry is whether the probation officer used the probation search to help police evade the Fourth Amendment's usual warrant and probable cause requirements or whether the probation officer enlisted the police to assist his own legitimate objectives. A probation officer does not act as a stalking horse if he initiates the search in the performance of his duties as a probation officer.

67 F.3d 790, 794 (9th Cir. 1995), *rev'd on other grounds*, 519 U.S. 148 (1997) (internal citations omitted). In *U.S. v. Grimes*, the Second Circuit expressly reserved judgment on whether to recognize the "stalking horse" defense. 225 F.3d 254, 259 (2d Cir. 2000). Then, in *Reyes*, the court rejected it. 283 F.3d at 463 ("Rather than hypothetically construct the theory and then limit the parameters of the hypothetical theory, we apply Occam's razor and decide that the doctrine is not a valid defense in this Circuit."). As the court explained:

> A probation officer is responsible for ensuring that a convicted person serving a term of federal supervised release is not violating the conditions of his supervised release, which includes verifying whether the supervisee is dealing in drugs or committing other crimes. Law enforcement officers are yoked with similar responsibilities to root out crime in the public at large. Accordingly, the objectives and duties of probation officers and law enforcement personnel are unavoidably parallel and are frequently intertwined. *Indeed, it is difficult to imagine a situation where a probation officer conducting a home visit in conjunction with law enforcement officers, based on a tip that the probation officer has no reason to believe conveys intentionally false information about a supervisee's illegal activities, would not be pursuing legitimate supervised release objectives.* Consequently, the notion of the "stalking horse" stands in stark contrast to the law governing the long-established practices of probation and parole officers.

11

Id. at 463-4 (internal citations and footnote omitted) (emphasis added). In *U.S. v. Newton*, the Second Circuit reaffirmed its "rejection of stalking horse challenges[,]" turning aside the argument that *Reyes* had limited its rejection of that defense to home visits and was therefore inapplicable to warrantless searches. 369 F.3d 659, 667 (2d Cir. 2004). Judge Rakoff has since rejected the argument that *Reyes* and *Newton* leave room for a "stalking horse" defense where the probation officer is not pursuing legitimate supervision objectives. *See U.S. v. Taylor*, 06 Crim. 529, 2006 WL 2789987, at *3 (S.D.N.Y. Sept. 26, 2006). In light of *Grimes*, *Reyes*, and *Newton*, as well as subsequent district court precedent, it is crystal clear that the stalking horse theory is not a valid defense to warrantless searches of probationers, parolees, or individuals on supervised release in this Circuit.

### 3. Narcotics Conspiracies and "Stale" Information

It is well established that the information presented in support of probable cause for a warrant cannot be "stale." *U.S. v. Martino*, 664 F.2d 860, 867 (2d Cir. 1981). "Although many factors will have some relevance, the principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law. Where the supporting affidavits present a picture of continuing conduct or an ongoing activity, as contrasted with isolated instances of illegal acts, the passage of time between the last described act and the presentation of the application becomes less significant." *Id.*

As the Second Circuit explained in *Rivera v. U.S.*, "[i]n investigations of ongoing narcotics operations, we have held that intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale." 928 F.2d 592, 602 (2d Cir. 1991) (citing *Martino*, 664 F.2d at 867 (22 days); *U.S. v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) (5 weeks); *U.S. v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990) (18 months)).

Indeed, then-Chief Justice Brieant noted in *U.S. v Feola* that "[n]arcotics conspiracies are the very paradigm of the continuing enterprises for which the courts have relaxed the temporal requirements of non-staleness." 651 F. Supp. 1068, 1090-91 (S.D.N.Y. 1987) *aff'd*, 875 F.2d 857 (2d Cir. 1989). Courts in this district have repeatedly concluded that narcotics offenses are the sort of crime for which even months-old information can support probable cause. *See, e.g.*, *U.S. v. Enoa*, 93 Crim. 285, 1993 WL 404154, at *2 (S.D.N.Y. Oct. 7, 1993) (four months); *U.S. v. Leung*, 92 Crim. 585, 1992 WL 395592, at *6 (S.D.N.Y. Dec. 15, 1992) (25 days). As summarized by Judge Lynch, "courts have accordingly found probable cause to remain current in narcotics cases even where the gap between the most recent information and the search was substantial." *U.S. v. Melissas*, 05 Crim. 107, 2005 WL 2414550, at *2 (S.D.N.Y. Sept. 21, 2005); *see also U.S. v. Gayle*, 08 Crim. 1244, 2009 WL 4667093, at *3 (S.D.N.Y. Dec. 8, 2009) ("[C]ourts in the Second Circuit have found probable cause to remain current in narcotics cases even when the gap between the most recent information and the search was substantial.").

### 4. When a Suppression Hearing is Required

"An evidentiary hearing on a motion to suppress ordinarily is required if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question.'" *U.S. v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) (citations omitted) (finding abuse of discretion where a district court refused to hold a suppression hearing as to the existence of probable cause). In the Second Circuit, "[a] defendant is entitled to an evidentiary hearing on a motion to suppress only if the defendant establishes a contested issue of material fact." *U.S. v. Noble*, 07 Crim. 284, 2008 WL 140966, at *1 (S.D.N.Y. Jan. 11, 2008) (Sullivan, J.) (citing *U.S. v. Dewar*, 489 F. Supp. 2d 351, 359 (S.D.N.Y. 2007) (citing *Pena*, 961 F.2d at 339)) (deeming an evidentiary hearing

13

appropriate for a claim with disputed facts, but denying a hearing on a second issue because "nowhere in the defendant's affidavit does the defendant raise a material, contested issue of fact in relation to his motion to suppress the firearm"). "A defendant seeking a hearing on a suppression motion bears the burden of showing the existence of disputed issues of material fact." *U.S. v. Rush*, 352 F. Supp. 2d 383, 386 (E.D.N.Y. 2005) (citation omitted).

"To create a factual dispute, a defendant must submit sworn factual allegations from a person with personal knowledge of the underlying facts . . . . [A]n evidentiary hearing is not necessary if the defendant's allegations are general and conclusory." *U.S. v. Shamsideen*, 03 Crim. 1313, 2004 WL 1179305, at *9 (S.D.N.Y. Mar. 31, 2004) (requiring a suppression hearing where the defendant had only offered general and conclusory claims because defendant's lack of knowledge resulted from the Government's secrecy about a confidential informant). Statements submitted by an attorney in motion papers before a district court "cannot by themselves create a factual issue." *U.S. v. Mottley*, 130 F. App'x 508, 509-10 (2d Cir. 2005) (affirming denial of a suppression hearing where district court found that the defendant's affidavit did not demonstrate the existence of disputed material facts regarding the legality of a search); *accord U.S. v. Barrios*, 210 F.3d 355 (2d Cir. 2000) ("The affidavit submitted by Barrios's attorney was not made on personal knowledge."); *U.S. v. Mason*, 06 Crim. 80, 2007 WL 541653, at *2 (S.D.N.Y. Feb. 16, 2007) ("An affidavit of defense counsel who does not have personal knowledge of the facts and circumstances surrounding the events at issue is an insufficient basis for an evidentiary hearing.").[5]

---

[5] As noted in the Background section, these legal rules require the Court to exclude from its analysis the unsworn statements of fact offered by defense counsel in Defendant's motion papers. These statements include counsel's assertion that Defendant was placed in a police car with FBI agents during the search and her statement that the safe was removed from Defendant's apartment before it was cracked open. The Court does not address the question whether these facts, if proven true, would require that it suppress the evidence obtained during this search.

District courts are "not required as a matter of law to hold an evidentiary hearing if [defendant']s moving papers did not state sufficient facts which, if proven, would have required the granting of the relief requested by [defendant]." *U.S. v. Culotta*, 413 F.2d 1343, 1345 (2d Cir. 1969); *accord U.S. v. Rodriguez*, 08 Crim. 1311, 2009 WL 2569116, at *11 n.6 (S.D.N.Y. Aug. 20, 2009) ("This conclusory averment is insufficient to create a disputed issue of fact warranting a hearing because even if credited, Defendant would not be entitled to the relief requested (suppression of his statements)." (citations omitted)); *Rush*, 352 F. Supp. 2d at 386 (citing *Culotta*, 413 F.2d at 1345).

Denial of a request for a suppression hearing is reviewed for abuse of discretion. *See U.S. v. Andino*, 343 F. App'x 714, 716 (2d Cir. 2009) (affirming denial of a suppression hearing where defendant had not submitted a sworn affidavit); *see also U.S. v. Mathurin*, 148 F.3d 68 (2d Cir. 1998) (finding abuse of discretion where a district court denied a hearing notwithstanding an affidavit from the defendant stating that he never voluntarily waived his right to counsel).

### B. Application of Law to Facts

Applying this law, the Court concludes that Defendant's motion to suppress cannot succeed and that an evidentiary hearing is unnecessary.

As of December 7, 2011, Defendant's reasonable expectation of privacy was severely reduced by his status as a supervisee and his consent to the July 15, 2009 special condition of supervised release. *See Newton*, 369 F.3d at 665; *Reyes*, 283 F.3d at 461. The Government, in contrast, acted in service to a number of weighty and legitimate interests when it conducted the search. These interests included rehabilitation, deterrence, and Pakula's professional duty as a probation officer to act on the information he had received from the FBI. *See Griffin*, 483 U.S. at 868; *Reyes*, 283 F.3d at 457. Indeed, given that Defendant had consented to warrantless searches

of his residence so long as such searches were supported by reasonable suspicion and conducted in a reasonable manner, the search was justified if Pakula's conduct was "rationally and reasonably related to the performance of [his] duty" as a parole officer. *Newton*, 369 F.3d at 665-66 (citation omitted); *see also Reyes*, 283 F.3d at 260, 263.

Here, Pakula possessed information from FBI Agent Downs that Defendant had been caught on a wiretap discussing his role as a supplier of narcotics in a larger narcotics conspiracy. At least part of this information undoubtedly dated to the March 23, 2011 wiretap alleged in the Indictment. Because precedent and common sense confirm that the possession, supply, and distribution of narcotics as part of a conspiracy are quintessentially long-term undertakings, Pakula – and the FBI, as the source of his information – were justified in treating the March 2011 wiretap, plus any other information obtained either after March 23, 2011 or even a months-long period of time before it, as sufficiently "fresh" on December 7, 2011 to provide reasonable suspicion for a search. This conclusion negates Defendant's claim that the Government relied upon "stale" information and thus lacked a basis for reasonable suspicion that criminal activity was afoot – an undeniably low threshold.

Thus, there existed on December 7, 2011 a reasonable suspicion for the search, which placed it in conformity with the Fourth Amendment, particularly in light of the express terms of the special condition of Defendant's term of supervised release – which authorized searches "based on reasonable suspicion of contraband or evidence of a violation of a condition of supervised release." Further, in light of Pakula's duties as a parole officer, the Court concludes that his decision to initiate a search of Defendant's apartment based on the information provided by FBI Agent Downs was rational and reasonable.

This leaves open the question whether the search was conducted in a reasonable manner. Defendant states in his affidavit that he was handcuffed, placed in the hallway, and briefly allowed back into the apartment to dress and use the bathroom. (Washington Aff. at ¶¶ 4-6.) Pakula notes that Defendant was "restrained" during the search. (Pakula Dec. at ¶ 7.) Defendant further states that the agents opened a locked safe during the search. (Washington Aff. at ¶ 7.) These facts do not support the claim that this search was conducted in an unreasonable manner.

First, if Defendant's claim is a variant of the "stalking horse" theory, it must be rejected as a matter of law. *See Newton*, 369 F.3d at 667; *Reyes*, 283 F.3d at 463.

Second, if Defendant alleges that the search of his apartment was valid, but not the search of his safe without specific consent or a warrant, this argument cannot succeed. Given that Plaintiff had consented to a search condition in his terms of supervised release, and that this term covered his "person" and "residence," it would have been objectively reasonable for the officers to conclude that the consent manifested in that search condition extended to closed containers within the apartment. As the Supreme Court explained in *Florida v. Jimeno*:

> We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container. "Contraband goods rarely are strewn across the trunk or floor of a car." The authorization to search in this case, therefore, extended beyond the surfaces of the car's interior to the paper bag lying on the car's floor.

500 U.S. 248, 251 (1991); *see also United States v. Sparks*, 287 F. App'x 918, 920 (2d Cir. 2008) ("A consent to search a particular location does not automatically extend to all closed containers within that location. It must be 'objectively reasonable' under the circumstances for the searching officer to believe that [] the scope of the consent included permission to open particular containers within the property." (citations omitted)). Further, it would make little

17

sense for a court-imposed sentence of supervised release to include a search condition that sweepingly authorized searches of a supervisee's person, residence, office, and vehicle on the basis of reasonable suspicion, but then shielded behind a higher level of Fourth Amendment protection any contraband that the supervisee placed within a container and maintained on his person or in his office, residence, or vehicle. Given Defendant's steeply diminished expectations of privacy, an objectively reasonable interpretation of Defendant's consent to the search term, and the legitimate Government interests that extend past a search of Defendant's residence and into containers capable of storing contraband located therein, the Court concludes that even accepting all of the facts stated by Defendant in his affidavit, the Government did not violate Defendant's Fourth Amendment rights by opening his safe without specific consent or a warrant.

Finally, if Defendant alleges that the FBI agents behaved improperly by detaining him during the search of his apartment, that basis for suppression also fails. It is well established that law enforcement may detain a suspect, in handcuffs if necessary, while conducting an otherwise valid search. *See, e.g., Michigan v. Summers*, 452 U.S. 692, 704-05 (1981) ("[F]or Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (footnote omitted)); *Bolden v. Vill. of Monticello*, 344 F. Supp. 2d 407, 419 (S.D.N.Y. 2004) ("[A] warrant to search a home for drugs 'implicitly carries with it authority to detain the occupants at the premises while the search is conducted.'" (citing *Speights v. City of New York*, Nos. 98 Civ. 4635, 98 Civ. 4636, 2001 WL 797982, at *5 (E.D.N.Y. June 18, 2001))); *United States v. Newton*, 181 F. Supp. 2d 157, 172 (E.D.N.Y. 2002) *aff'd*, 369 F.3d 659 (2d Cir. 2004) ("During execution of a search warrant, detention of the occupants of the premises being searched is justified to: (1) minimize the risk of harm to the officers; (2) prevent

flight in the event that incriminating evidence is found; and (3) facilitate the orderly completion of the search." (citation omitted)); *see also id.* ("Language in subsequent cases indicates that *Summers* applies to all valid searches, not just those conducted pursuant to a warrant." (citations omitted)).

Thus, even if every single fact alleged by Defendant in his affidavit were true, and every single factual dispute were resolved in his favor, Defendant's motion to suppress would still fail as a matter of law.

That said, the Court notes that there are almost no serious factual disputes in this case. Defendant does not take issue with the Government's evidence, does not claim that he stopped participating in a conspiracy such that the wiretap information was actually stale,[6] does not allege that the Government mistook his voice on the March 23, 2011 wiretap, and does not allege any facts even tending to indicate police behavior implicating Fourth Amendment violations during the search. This is not a case where the Defendant and the Government offer divergent accounts that can only be resolved through credibility assessments and other evidentiary determinations. To the contrary, the parties appear to agree on most (or even all) facts relevant to the constitutional analysis. Unless the Court were to read Defendant's affidavit as very broadly and very generally alleging misconduct rising to the level of an unreasonable search, it cannot conclude on the basis of Defendant's affidavit that the search violated his Fourth Amendment rights. Such a broad and abstract interpretation of Defendant's affidavit is unwarranted. *See Pena*, 961 F.2d at 339 ("An evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and

---

[6] But even if that information were actually stale, it would not necessarily follow that law enforcement acted unreasonably by relying on that information as their basis of reasonable suspicion for the search.

nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." (internal quotation marks and citations omitted)).

Accordingly, the Court denies Defendant's request for a hearing on his motion to suppress. *See Culotta*, 413 F.2d at 1345 (noting that courts are "not required as a matter of law to hold an evidentiary hearing if [defendant']s moving papers did not state sufficient facts which, if proven, would have required the granting of the relief requested by [defendant]"). Because the Court concludes that the Government did not violate Defendant's Fourth Amendment rights by searching his apartment on December 7, 2011, Defendant's motion to suppress is denied.

### III. Conclusion

For the reasons stated above, Defendant's motion to suppress and request for an evidentiary hearing on that motion to suppress are DENIED.

The Clerk of Court is directed to close the docket entry at number six.

SO ORDERED.

Dated: New York, New York
November 7, 2012

_____
J. PAUL OETKEN
United States District Judge